IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

GREGORY J. SOLOMON,

    Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

    Defendant.

No. C14-0012

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................. 2

II.   PRINCIPLES OF REVIEW ........................................ 2

III.  FACTS ............................................................ 4
    A.   Solomon's Education and Employment Background ............ 4
    B.   Administrative Hearing Testimony ........................... 4
        1.   Solomon's Testimony .................................. 4
        2.   Vocational Expert's Testimony ......................... 7
    C.   Solomon's Medical History .................................. 7

IV.  CONCLUSIONS OF LAW ......................................... 9
    A.   ALJ's Disability Determination ............................... 9
    B.   Objection Raised By Claimant ............................... 11

V.    CONCLUSION .................................................. 16

VI.  ORDER ........................................................ 16

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Gregory J. Solomon on January 31, 2014, requesting judicial review of the Social Security Commissioner's decision to deny his applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits.[1] Solomon asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him disability insurance benefits and SSI benefits. In the alternative, Solomon requests the Court to remand this matter for further proceedings.

## II. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*,

---

[1] On March 31, 2014, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

2

674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the decision of the Administrative Law Judge ("ALJ") meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d

1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

### III. FACTS

#### A. Solomon's Education and Employment Background

Solomon was born in 1960. He is a high school graduate, and attended two years of college. In the past, Solomon worked as an apartment maintenance person, shear operator, residential sider, tow truck driver, and delivery truck driver.

#### B. Administrative Hearing Testimony

##### 1. Solomon's Testimony

At the administrative hearing, Solomon and the ALJ discussed his physical impairments. Solomon described having virtually no use of his left arm or hand. Specifically, Solomon testified that he can't pick items up or push a button with his left extremity. He stated that his arm "pretty much, just hangs around."[2] The ALJ inquired further:

> Q: . . . Now you said you can't operate a button or knob. What would stop you from pressing a button on a, I'm making this up, a computer keyboard or a cell phone or a remote control, why could you not use your fingers on your left hand to do something like that?
> A: I have no control over where my fingers are going, and my arm is so unsteady I would have a hard time even hitting the button. I suppose if I tried enough times,

---

[2] Administrative Record at 39.

>
> eventually I'd get it, but I really have no control over that hand or those fingers.
>
> Q: Okay. Could you use it to pick up a regular 12-ounce can of Coke? Could you use your left --
>
> A: No.
>
> Q: Okay, because you just can't control it, you can't put it where you want it in space, or you can't grasp the can or you can't lift up? What would stop you from doing that?
>
> A: All of those. I can't grab it, I can't hold it, I can't lift it up. I, I mean I can set it in that hand and get it to close on it. And the chances are it's going to let go.
>
> Q: Okay. Could you use it to open the car door, you know, whether it would have sort of a lever that you would lift up to open the car door on the driver's side? Could you use your left hand to, however it's designed, could you use your left hand for that purpose?
>
> A: No, your honor. And I tried doing that, but I can't.

(Administrative Record at 39-40.)

The ALJ also inquired about Solomon's difficulties with his lower extremities. According to Solomon, he is limited in the length of time he is able to stand, and he is unable to walk very far. Solomon explained that "[m]y [right] knee is very much in pain all the time. My left leg was affected by the stroke. I'm pretty unstable with it. I don't have much strength in my left leg."[3] Solomon also stated that cold whether severely affects his left leg and makes it difficult to walk.

Lastly, the ALJ asked Solomon what types of things he could accomplish around the house. Solomon stated that "I really have a hard time doing pretty much anything at home that takes more than one hand."[4] For example, Solomon testified that cooking is

---

[3] Administrative Record at 42.

[4] *Id.*

5

difficult because he is unable to chop vegetables or meats. He also stated that he can't perform any maintenance around his house, like using a ladder to change a light bulb.

Solomon's attorney also questioned Solomon at the hearing. Solomon's attorney inquired how long Solomon had been having difficulties with his right knee. Solomon replied that his knee had bothered him for "a lot of years." He stated "I've had many injuries to this knee. And it's been an ongoing problem for a long time."[5] According to Solomon, he had limitations stemming from problems with his right knee prior to seeking disability. He stated that he could not carry anything "real heavy" and could only stand "for just so long."

Solomon also testified that his physical impairments make sleeping difficult. Solomon explained that "I don't sleep. I mean I sleep three to four hours a night. I'm always tired."[6] Solomon's attorney questioned Solomon further on his sleeping difficulties:

> Q: And what's the reason for the non-sleep?
> A: I just can't sleep. I wake up about once every hour, and after a couple of hours, I cannot get comfortable laying down --
> Q: Okay, so it's your physical stuff that's --
> A: Well, yeah, I just plain hurt when I try to lie down. When my body gets sore, I can't, I wake up about once every hour, every hour and a half. And after three, four hours, that's it, I'm done, I can't sleep anymore.

(Administrative Record at 47-48.)

Lastly, Solomon's attorney inquired whether Solomon had ever been treated for depression as a result of his physical impairments. Solomon testified that he had never been treated for depression, but opined that he probably should be treated for it. He

---

[5] *Id.* at 45.

[6] Administrative Record at 47.

testified that having nothing to do all day drives him "absolutely nuts." He stated "I'll be plan [(sic)] flat-out and honest with you, the only reason I don't have a bullet through my head is my parents are still alive. And I can't do that while they're still alive. I hate my life. My life is so absolutely miserable 24 hours a day."[7]

### 2. Vocational Expert's Testimony

At the hearing, the ALJ provided vocational expert Vanessa May with a hypothetical for an individual who is able to perform:

> light work[.] . . . The worker is able to stoop, crouch and kneel occasionally, but cannot crawl or climb ladders, ropes or scaffolds in the course of his work. When it comes to handling and fingering on the non-dominant left hand, the worker is able to do that only occasionally, no more than occasional on the non-dominant left hand, and overhead reaching with the left upper extremity is only occasional. I'd like you to assume this worker cannot do work at, where you would be exposed to hazards such as work at unprotected heights or working dangerous moving machinery or operating [a] motor vehicle. I want you to assume that the worker cannot be exposed to extremes of cold temperature, and can't be exposed to extremes of airborne irritants, . . . such as dust, fumes or high humidity.

(Administrative Record at 50-51.) The vocational expert testified that under such limitations, Solomon could not perform his past relevant work. The vocational expert testified, however, that Solomon could perform the following jobs: (1) information clerk, (2) usher, and (3) photocopy machine operator.

### C. Solomon's Medical History

In March 2012, Solomon suffered a stroke. Following the stroke, Solomon developed problems with his gait, necessitating the use of a cane or walker. In June 2012, Solomon contacted the VA Hospital in Iowa City, Iowa, via telephone, complaining of

---

[7] *Id.*

7

having "a lot" of pain in his right knee. Solomon stated that he believed his right knee was worse since his gait was off following his stroke. He stated that he had constant pain at a level of 6-7/10. Solomon indicated that the pain is bad at night, and keeps him awake at night. The nurse he was speaking with told him that she would talk with a doctor about prescribing him pain medication.

In November 2012, Solomon met with doctors at the VA Hospital. The doctors noted that while Solomon had been improving since his stroke, he stopped his home physical therapy in September and his progress was "very slow." The doctors recommended Solomon for occupational therapy and hand rehabilitation. The doctors felt that Solomon "still [had] room for improvement."

In January 2013, Solomon began meeting with Ann Dworzynski, an occupational therapist. Dworzynski found that Solomon was impaired with basic hygiene tasks (oral hygiene, bathing/showering, dressing), household tasks (cleaning, meal preparation, shopping, household maintenance), and work tasks. Dworzynski believed that there was an "excellent" chance that Solomon could achieve all his goals with regard to improving his activities of daily living. Solomon worked with Dworzynski through May 2013. In discharging Solomon from her care, Dworzynski noted that Solomon had "exceeded" expectations, and his goal attainment was "partially achieved." Dworzynski explained that Solomon's "[g]oal attainment [was] sufficient for discharge." Dworzynski concluded that:

> [Solomon] has made significant progress with left shoulder AROM flexion, abduction, wrist extension, [and] forearm supination. [He] continues to have left hand fine motor coordination deficits. . . . [Solomon's] grip strength has significantly improved, however, continues to be below average normal for his age group. Despite [Solomon's] significant left shoulder AROM improvements, [he] has abnormal movement patterns with grasp/release of objects which limits functional tasks. [His] left arm lacks endurance which impacts quality and quantity of tasks completed. . . . [Solomon] has made significant progress overall, however

> lacks coordination of left [upper extremity] that impacts higher
> level [activities of daily living] and return to work.

(Administrative Record at 481.)

In July 2013, Solomon presented at the emergency room due to injuring his right knee and left hand. According to Solomon, his right knee gave out on him and he fell to the ground injuring his left hand. Solomon used a cane to help him walk. An emergency room nurse noted that Solomon was "using [the] cane well. [He was a]ble to bear weight with [the] cane and walk[] slowly."[8] X-rays of Solomon's knee showed "severe" right knee osteoarthritis with probable intra-articular bodies. Upon examination, Dr. Derik Falk, M.D., opined that Solomon suffered a right knee and left wrist sprain. Dr. Falk recommended "conservative" treatment, including pain medication.

## IV. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Solomon is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

---

[8] Administrative Record at 466.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In order to establish a disability claim, "the claimant bears the initial burden to show that [he or] she is unable to perform [his or] her past relevant work." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id.* The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545, 416.945. "It is 'the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Page*, 484 F.3d at 1043 (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Solomon had not engaged in substantial gainful activity since March 14, 2012. At the second step, the ALJ concluded from the medical evidence that Solomon had the following severe impairments: residuals of a cerebrovascular accident (stroke), coronary artery stent, and right knee osteoarthritis. At the third step, the ALJ found that Solomon did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Solomon's RFC as follows:

> [Solomon] has the residual functional capacity to perform light work . . . except he can occasionally stoop, crouch, and kneel.

> He should avoid ladders, ropes and scaffolds. The individual can do occasional handling and fingering with his left upper extremity. He must avoid working around hazards such as unprotected heights and moving machinery. He should avoid extremes of cold, airborne irritants, dust, fumes, and high humidity.

(Administrative Record at 20.) Also at the fourth step, the ALJ determined that Solomon could not perform his past relevant work. At the fifth step, the ALJ determined that based on his age, education, previous work experience, and RFC, Solomon could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Solomon was not disabled.

### B. Objection Raised By Claimant

Solomon argues that the ALJ failed to properly evaluate his subjective allegations of pain and disability with regard to his right knee. Specifically, Solomon asserts that the ALJ incorrectly determined that he had no treatment for his right knee pain prior to July 2013. Solomon maintains that the record demonstrates that: (1) He was diagnosed with arthritis in his knees in 2005; (2) a 2009 x-ray showed arthritis in his knees; and (3) x-rays from 2013 confirmed progression of his arthritis in his right knee.[9] Solomon concludes that this matter should be remanded for a new credibility determination, particularly with regard to his subjective allegations of right knee pain.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v.*

---

[9] *See* Solomon's Brief (docket number 11) at 7-10.

*Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ should also consider a "a claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ, however, may not disregard a claimant's subjective complaints "'solely because the objective medical evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009)).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman*, 596 F.3d at 968; *see also Finch*, 547 F.3d at 935 (same); *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors.'" *Renstrom*, 680 F.3d at 1066 (quoting *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010)); *see also Ford*, 518 F.3d at 982 (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally

defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

The ALJ addressed Solomon's subjective allegations of right knee pain as follows:

> [Solomon] asserted he cannot do home maintenance or even change a light bulb because he is too unsteady on his feet. Nevertheless, there is no hint in the record that he is unsteady or dizzy or that he lacks strength or control of his legs. He said that the VA staff had told him 10 years ago that they would do knee replacement surgery when he is older. That sounds pretty significant, but, again, there is no hint in the record of any such current suggestion or recommendation for that. There is no record of treatment for either knee or leg during the time in question apart from the recent fall the month prior to the hearing held August 5, 2013.

(Administrative Record at 22.) Solomon takes exception to the ALJ's findings and directs the Court to various reports in the record to support his assertion that he has suffered from knee problems since 2005.[10] In reviewing these various medical records, the Court finds that they simply reflect a history of Solomon having been diagnosed in the past with osteoarthritis in his right knee between 2005 and 2013. None of these records indicate that Solomon ever received any type of treatment for his knee pain, let alone provide that he has any limitations stemming from his knee pain. The records simply provide that Solomon has a history of arthritis in his knees. Similarly, Solomon points out a medical record from June 2012, where he called the VA Hospital and talked to a nurse complaining of right knee pain.[11] In his conversation with the nurse, Solomon himself opined that his right knee pain was worse following his stroke. However, Solomon did not meet with any

---

[10] *See* Administrative Record at 297; 305; 309; 314; 317; and 325.

[11] *Id.* at 312.

medical source to confirm his beliefs, and Solomon points to no opinion in the record to support his belief. The record in question provides that the nurse simply stated she would talk to a doctor about possibly prescribing him medication. Lastly, Solomon refers the Court to an emergency room visit and x-ray of his right knee following a fall in July 2013. While the x-ray confirmed that Solomon suffered from osteoarthritis in his right knee, the doctor diagnosed him with a knee sprain, and treated him "conservatively" with only pain medication.[12] Having reviewed the entire record, the Court finds no merit to Solomon's argument regarding his subjective complaints concerning his right knee.

Moreover, there is substantial evidence in the record to support the ALJ's credibility determination. In his decision, the ALJ thoroughly addressed Solomon's medical history in making his credibility determination.[13] The ALJ also thoroughly addressed Solomon's activities of daily living in making his credibility determination. For example, the ALJ noted that Solomon stated that he could "walk from one end of Walmart to another [(sic)]. He testified he lived alone. He stated he drives with one hand and was able to shop for groceries."[14] The ALJ also found that when used appropriately, medication was effective in reducing or controlling Solomon's symptoms.[15] Furthermore, the ALJ pointed out that Solomon "has a relatively poor work record in that he had no earnings in 2009 and did not earn more than $6800 prior to his [stroke] in 3/12."[16] The ALJ concluded that:

> Based on the above discussion and inconsistencies in the record as a whole, [Solomon's] allegations concerning the

---

[12] *Id.* at 469-470.

[13] *Id.* at 21-24 (addressing inconsistencies with Solomon's alleged left hand and arm, shoulder, and leg problems and his functional abilities).

[14] Administrative Record at 23.

[15] *Id.*

[16] *Id.*

existence, persistence and intensity of symptoms and functional limitations are not given full weight or credibility, but only such as reflected in the residual functional capacity assigned by the undersigned.

In conclusion, the record considered as a whole supports some limitations in [Solomon's] ability to perform work-related activities. However, those limitations are adequately accommodated by the residual functional capacity (RFC) outlined above, which is consistent with objective medical findings and opinion evidence of record, as well as the documented activities. The record does not support greater limitations.

After careful consideration of the evidence, the undersigned finds that [Solomon's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Solomon's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(Administrative Record at 24.)

In summary, it is clear from the ALJ's decision that he thoroughly considered and discussed Solomon's treatment history, medical history, functional restrictions, effectiveness of medications, activities of daily living, and prior work history in making his credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Solomon's subjective allegations of pain and disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered,

but for good reasons explicitly discredited Solomon's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## V. CONCLUSION

The Court finds that the ALJ properly determined Solomon's credibility with regard to his subjective complaints of pain and disability, including his allegations of pain in his right knee. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VI. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;
2. Plaintiff's Complaint (docket number 3) is **DISMISSED** with prejudice; and
3. The Clerk of Court is directed to enter judgment accordingly.

DATED this 8th day of November, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA